Good morning, Your Honors. Adante Poynter on behalf of Mr. Nelson, who is the appellant in this matter, appellee. We're here because today, the case is at issue and at bar because Mr. Nelson filed a civil rights complaint alleging that his civil rights as well as his state rights have been violated. The district court granted defendant summary judgment motion in this matter and impermissibly granted that summary judgment motion because the district court overlooked the record which is rife with a number of genuine material disputes, issues in dispute. In doing so, the district court denied Mr. Nelson his right to a jury trial. The district court impermissibly sat as the fact finder on the summary judgment motion and actually weighed the credibility of the evidence when that was more proper for a jury to do and therefore that case, Mr. Nelson's case, should have proceeded to the jury. The district court also, in terms of weighing this evidence and sitting as fact finder, took a look at the credibility and actually bootstrapped Mr. Nelson to a particular theory that was actually the defendant's theory and in doing so, reviewed and held those facts in light that was least favorable to Mr. Nelson, which the court is not entitled to do. Seeing as Mr. Nelson was a nonmoving party, those facts should have been interpreted in light that was more favorable to Mr. Nelson. The linchpin of the district court's decision seemed to be that your client was your client's own testimony, correct? Own testimony that? About where he was when the incident occurred. That is partially what the district court relied upon. Now, leaving aside all the other evidence in the case from the other witnesses, if you only had your client's testimony about where he was, do you think you have a case, I mean, that seems to me that if you consider only your client's testimony that the district court is probably correct in its assessment? Well, if the court is or does exclusively focus in on Mr. Nelson's testimony, in exclusion to all the other evidence that's been proffered either by recipient witnesses or the defendants themselves, then there is a distinct possibility that the district court ruled on this correctly. But with that being said, the plaintiff is not necessarily always in the best position to offer evidence as it relates to how they were injured. And your theory is you have to look at the totality of the evidence supplied by other witnesses. And so isn't the key issue here what the district court erred as a matter of law in precluding you from considering that other testimony? Well, I think that the key issue here is did the district court essentially focus in exclusively upon one particular witness as opposed to looking, as Your Honor just said, at the totality of the witnesses as well as the evidence that had been submitted. There is a wealth of evidence, an abundant amount of evidence in the record that goes to actually putting Mr. Nelson in a different position than what he himself may remember as a result of this traumatic event. Mr. Nelson's injury was actually to his head and to his eye. And so his ability to necessarily recall the facts in such a chaotic and a situation may not be necessarily the ultimate gospel in terms of what necessarily happened on that particular night. In fact, there are other witnesses. Apparently specific in his testimony. And I found the testimony of the other students who were with him to be far more ambiguous. That may be Your Honor's take. But I think there are also, if you look at the testimony provided, for example, by Bridget Collins or Lunguta Subtimita or Ms. Vitito and even the defendants themselves. Ms. Vitito and Ms. Collins in particular are the depositions that I read and didn't find that they were, I wouldn't call them contradictory or inconsistent with Mr. Nelson's testimony. But Mr. Nelson's testimony seems to be far more specific. Well, they have Mr. Nelson with the group outside before the shooting started. They have Mr. Nelson with the group after the shots rang out. And they have Mr. Nelson within close proximity when the shots actually impacted Mr. Nelson. More importantly, Your Honor, if you were to look at the defendants as it relates to the testimony that they proffer through their deposition transcripts, they themselves say that they did not witness a door open. And that directly contradicts what Mr. Nelson has said. So if that is the case and that the defendants who actually delivered the blow, the intentional act, the conduct here, did not see this door open, then that in and of itself is a genuine issue of material dispute that should have properly gone to the jury as opposed to exclusively relying upon Mr. Nelson. What will you have to show in order to prevail? What do you have to show? Do you have to show that the police aimed at him deliberately? We have to show that it was an intentional act, Your Honor, and an intentional act meaning an intentional seizure. And I may actually ask for more of a clarifying question. I mean, if you're specifically looking at the 1983 causes of action as it relates under the Fourth Amendment, then we do need to show that there was a seizure. And that is by showing that there was – I think your Fourth Amendment case is much easier to make than your Fourteenth Amendment case and your outrageous conduct case. Why don't you focus on the Fourth Amendment case just for the time being? I mean, if you're presenting your argument to the jury and you're stating your theory in a nutshell about what happened, I gather it's that the police fired unprovoked into a crowd, right? Yes. The police fired unprovoked into a crowd that Mr. Nelson was a part of. The police had time to deliberate. The police that fired the shot were actually ordered to fire into the crowd. And the police had knowledge before even arriving at this situation that the police were using, which they had been trained not to fire beyond a certain point, beyond 30 feet, because of the inaccuracy of those weapons. Let me stop you right there, and I know Judge Wallace has a follow-up question, but just one second. What's your best case under your theory that says that the – that's a Fourth Amendment violation and the officers aren't entitled to qualified immunity? What's the closest case to your factual statement? Well, there are – we cited a number of cases within our brief, Your Honor, as it relates to the Fourth Amendment. To – at this very second, I would have to refer to the brief, but I would think – Well, that's fine. We can do that. I know Judge Wallace had a question. I've wanted to press this a little further, what you'd have to show. In order to get a Fourth Amendment claim even off the ground, you've got to show that there was a seizure. Yes, Your Honor. Okay. Now, to find out whether or not there's a seizure, you can't just look at what happened right then. You'd have to put it into context. Into context, we've got 2,000 young adults trashing an apartment complex. We've had police officers injured. We've had a police car that was pounded upon, and they had to bring in police officers to rescue the police officer in the car. Later on, the place is trashed. You've got a near-riot situation. Then the police officers come, and they don't try to get the people to stay where they are and seize them. They try to disperse them. And it strikes me that I don't see the evidence of seizure. What the police officers have done is try to disperse. They've already had one sweep, which hasn't eradicated this group, including your client, and so they're coming through with another sweep, not to seize them, but to disperse them. How are you going to prove seizure in this case? Your Honor, the seizure has proved by and in of itself that Mr. Nelson's freedom of movement was terminated. The officers had a government interest in terms of responding to the overall context of what was going on there, which Your Honor referred to, as it relates to the background of the conduct of the overall partygoers. But Mr. Nelson and his group were actually trying to comply with what the officers were asking. So they were not a part of that conduct. I don't know much about the case except what happened at that particular time. What we do know is that for some time, whatever length of time, there's been a virtual riot of 2,000 people in an apartment complex and that the police officers are trying to disperse them to get them away. Now, seizure cases, the ones that you cited, the ones where an individual is coming towards the police, should they back off or should they shoot, those are the seizure cases. But these, no one wanted to seize these individuals. They want them to leave. And it strikes me that I'm not sure how you'd prove a seizure with the total facts in context. Right. And looking at Graham, Your Honor, where Graham, one of the elements of Graham is actually looking at the particular use of force. Now, clearly, with the other acts of misconduct that were going on that night, the officers had a right and a duty to try to stop that type of conduct from taking place. But as it relates to Mr. Nelson at that particular specific use of force, that was not necessary against Mr. Nelson. The officers terminated his freedom of movement. He was looking to leave the complex and comply with the officer's orders. That goes to whether or not they acted unreasonably. If you first can prove a seizure to get to the Fourth Amendment, then you have to prove that it was unreasonable. And it seems to me that you can't take the context of what happened in these two or three minutes when your client was coming out. You have to take into context what was going on with this riot, and they had 30 or 40 policemen facing 2,000 individuals, and whether the use of these instruments they were shooting was unreasonable. And wouldn't you have to be able to prove not only that they weren't dispersing but trying to seize, and that in the context of this near-riot, what they used in these firing these missiles was unreasonable? Yes. You have to prove that, too. We would have to prove that. And to go back to Your Honor's earlier question as it relates to the seizure, once again, Mr. Nelson was not a part of the other acts that were going on that night. In fact, Mr. Nelson was trying to leave the complex that night. The officers, by firing an intentional act, they were ordered to fire upon Mr. Nelson, who was a part of a passive, non-resistant group. That is a seizure. Mr. Nelson was trying to leave. It was an intentional act, and in that act, although they intended to shoot and may not have intended to necessarily strike Mr. Nelson, the intent to engage in the act is enough, given the cases that we've seen. Even if they were under instructions to fire at the walls in order to create an atmosphere in which students couldn't come out to that area? Well, that's not in the record. It's clear that somebody intentionally fired the gun. Yes. That's not an accidental discharge case. Yes, Your Honor. But is there any evidence that they intentionally fired at Mr. Nelson? Yes. They were ordered to fire upon the group. That's within the record. Sergeant Wilson ordered the officers who had the pepper ball machines to fire upon that group. That group had not thrown any bottles. That group had not been verbally aggressive towards those officers. Now, that is in dispute as well. And so, once again, if you look at the seizure, just the seizure component of the elements under the Graham analysis, what was going on in that particular situation, that particular use of force, is what's important. Now, it's not exclusive to what was going on generally that night. And I also want to correct, while there is some dispute as to whether it was 200, 300, 1,000, I have not heard 2,000. But, you know, the numbers continue to grow against my client. But what I am sure is that my client was a part of five young men and women who were seeking to comply with what the officers' orders were. The officers were ordered to fire upon this group of passive people who were seeking to comply with the officers' orders. And the officers knew when they fired that particular weapon that it was too, they were too far away in violation of their training and the given law, and that this is the type of foreseeable risk and harm and injury that would occur. And that is exactly what happened. And that's why they're trained not to engage the officer that is in this particular use of force. Mr. Perney, we've got about two minutes left. I'd like to reserve the rest of my argument. There's another question. Thank you. Thank you. Thank you. May it please the Court. I'm Don Willenberg from Gordon and Reese, representing all but one of the UC Davis officers. I plan to take half of Appalee's time and then turn the lectern over to Jay Scott Smith, who is counsel for the city of Davis officers. Counsel for UC Officer Chang is also available should the Court have any questions specific to Officer Chang, but does not otherwise plan to argue. Would you move the mic up just a little bit? Thank you. Could I ask you what I see the problem on the case? Please. And I'm only one-third of the Court. I will entertain questions. We've gone over with the plaintiff the difficulty that he has, as I see it, of proving a case. On the other hand, Judge Englund never got to that. Judge Englund had a different theory. Judge Englund's theory was that the plaintiff has indicated that he was inside the building for 10 to 15 minutes, that he heard the warning, stay inside. He chose to go outside for his own reasons, but he chose to go outside, and that he heard the paint balls coming, whatever those balls are. He heard them coming either from inside or as he was walking out. And then Judge Englund says there's this other evidence that tells the story differently, and I'm not going to consider that. I'm only going to consider the plaintiff on the basis that this evidence cannot be brought in by the plaintiff because it's inconsistent with the plaintiff's statement. That was the basis upon which he made his decision. So we don't get into all these other issues. What we get into is whether or not, in the context of summary judgment, you can have other witnesses testify which must be considered by the Court. Now, the cases that he relies on for that, I'm not sure they fit here. They're almost the cases that you have to show that these other statements were fraudulent or an effort to cloud the record. Tell me how we can sustain this particular decision by Judge Englund. The rest of it seems to me to be a sort of aside. We have to base upon what he, the decision he made. So that's the difficulty I'm having with the case. I'm not sure what he did he can do. I think it is certainly true that theoretically statements from witnesses other than the plaintiff could be considered in discerning whether or not summary judgment was appropriate. The judge here did not look at the issues of sham or fraudulent declarations so much as is there any real difference here. The case that he looked at was not the sham declarations case. He relied instead on the Prosser case in which plaintiff's deposition testimony said that he was in a prison riot situation, a riot situation like ours. The guards came to his aid immediately. He relied on a very equivocal declaration from another prisoner saying that the guards had delayed in coming to his aid. That's somewhat like the situation that we have here. Even if you consider this other testimony, it doesn't get you to where counsel would like it to get you. It does not state that he, that Plaintiff Belson was outside and had been outside for a long time before he was shot. Instead, it says things like, I heard shots and saw him fall. Tim came out through the door and that's when he got shot. That, as Judge Bybee said, is perfectly consistent with our story. Our details about the case. Perhaps. But to get back to Judge Wallace's point, which concerns me as well, and that's why, if you don't mind the interruption, as a theoretical matter, I just don't see how you can apply the self-contradiction doctrine to other witnesses' testimony. Now, I realize that the other circuit in Prosser did sort of that, but they also noted that the witness contradicted himself in his own testimony. I mean, the idea of the self-contradiction bar is that you can't testify to deposition and try to cure your problems by affidavit later. And I accept that, but that's not what we have here. That's absolutely right. And that's why the court below did not rely on Radobanko, the decision that involves that, so much as it does Prosser. I mean, it seems to me, though, that we haven't extended that doctrine that far in this circuit, and I'm not sure the Eighth would go that far under these facts either. So that's the threshold question. The rest of it we can debate. But, I mean, for me, that's the key issue, is whether he got that evidentiary ruling wrong. Again, even if, and we have invited the Court in our briefs to look at the specific evidence that's offered, and that evidence does not create an issue of fact, even as to where Tim was. I would also suggest that in addition to the Prosser case, very helpful would be the Rucker case, also not from this district, but also a case involving an accidental victim of police activity, a spectator there. And in that case, there was also equivocal testimony from another witness that the Court said was insufficient to stop a summary judgment. Well, but Rucker, as I understand, was for the proposition that the innocent bystander theory, that you don't get the seizure of an innocent bystander. That's a little bit different from what we're seeing. I mean, as I understand their argument, what they're saying is, look, we have evidence that he was part of the group. The group was intended to be seized because it was fired on, and construing the facts in the light most favorable to us, and therefore we get by summary judgment. And Judge England said, no, you can't contradict your own deposition. I'm not going to pay attention to the other statements. And that's where we are. Well, this Court, of course, can affirm on grounds other than those relied on by the district court. It sounds like you don't. I don't think you have. I think you can get to the same place on the seizure and on the 14th Amendment issues, but even beyond that, even were there, I would submit that the question of whether Tim was inside or outside is significant, is interesting, but it's also ultimately not dispositive. It's not dispositive for a lot of reasons. One, because even if he was seized, there's a question of reasonable force. And second, maybe more fundamentally, that even if there was a constitutional violation, there's no Section 1983 liability, because persons are entitled to qualified immunity unless clearly established law would have told defendants that their actions were unconstitutional or wrong. None of the cases cited by plaintiffs, and none of the ones that we could find, would give police any idea that shooting pepper balls in a riot situation was a violation of constitutional rights, none. If we disagreed with you on the merits of considering the other testimony, the Collins and Vitito testimony, and if we disagreed with you as to whether they create a conflict of fact, a genuine dispute of fact, can we reach the qualified immunity question at this level? Before the district court does, I think, is the question. Certainly, because the only issue there, then, is whether there was an issue of whether he had been seized at all. But if we can, this Court can say, even assuming that he was seized on the rest of the facts, we can look at whether or not that was reasonable, and we can look at whether there are any other cases out there. At that point, all we have are sort of allegations of facts. I mean, we just we have some depositions. We don't have a whole lot more to go on. We don't have a jury, for example, that's told us what the facts are, that's resolved those factual questions. Well, that's right. That's right. But that's true on every summary judgment. Let's one scenario is there's a big riot and a lot of confusion and we don't know what's happening. And the second scenario is, no, this is a discreet bunch of kids who are entirely separate, there's no evidence at all they've done anything wrong, and somebody just gave the order to shoot without any provocation. Those are the two discreet things. And, you know, those are different factual scenarios. I would suggest there is no evidence that the kids were doing nothing. That is perhaps a characterization by counsel. But there is no evidence here that they actively disperse, that they obey the orders to disperse. Well, but they dispute that they were filing. They're through anything. They say they were trying not to disperse. They were trying to disperse. I mean, those are factual things. We can't possibly resolve here. That's correct. And need not be determined by any court in prior to determining whether or not there was a constitutional violation or whether qualified immunity should apply. I see I've already taken more than half my time. If I may defer to my co-counsel. Thank you. Good morning, Your Honors. My name is Jay Scott Smith. I'm here representing the interests of Sergeant Wilson, who was the sergeant who gave the order to use the pepper balls to disperse this crowd. First, I'd like to address Judge Wallace's question about whether or not this Court can get to the question of whether this is a seizure under these circumstances in light of the district court's opinion. And the simple answer to that is this Court, sitting as a court of appeal, can affirm or has the discretion to affirm on any grounds that for which there is a clear indication in the record. The record in this case contains nothing, and it is a very complete record on this question, to suggest that there was any purpose or intent of any officer, or in particular my client, to actually seize in the sense of gain physical control over any of the people who were at this, participating in this riot, bystanders, what have you. Were there any arrests on that night? There's an indication in the record, although it's a hearsay indication, in one of the police reports, two county sheriffs, who are also part of the mutual response, entered one of the buildings. In fact, they asked one of the officers, hold that door. I want that kid. And they ran in and arrested a kid. That's a hearsay indication. There were no mass arrests for drunkenness or underage drinking? No. There were no mass arrests. The only other arrest reflected in the record is Sergeant Wilson testified that before they retreated on the first instance, in fact, his first contact was he arrested a young lady for underage drinking and then realized that he had a problem, that he wasn't able to control the limited forces he had available, and that's when they made the initial assistance call. So in multiple places in the record, in fact, Bridget Collins specifically testified that she heard the words, or she testified, and it's at the plaintiff's page 112 through 114 of the plaintiff's excerpts. She testified that the officers walked around to the front of this breezeway, gave the order, disperse or you will get shot. And then they used the pepper balls. All of the officers characterized Sergeant Wilson's order as disperse the crowd, meaning shoot the pepper balls in order to disperse the crowd. Both Mary Garcia and Sergeant Brannigan specifically interpreted that order as shoot for walls, ceilings, what have you, in order to create an area saturation because that's what they, in fact, testified that they did in response to Sergeant Wilson's order. Are there circumstances under which an officer would fire a pepper ball at somebody in order to try and bring them down or seize them or stop them? I can imagine in some circumstances that an officer having a pepper ball gun at close range may try to use it to subdue an individual, but that's not what occurred here. And, in fact, when one considers the nature of this weapon, included in the record is the actual manufacturer's description. The manufacturer describes the sting or the pain felt by this weapon as being the rough equivalent of a paintball gun. And, in fact, the actual muzzle velocity is slightly less than a paintball gun. You know, considering that paintball guns are used for recreational purposes. That would not account for the injuries in this case. It wouldn't account for the injuries in this case because he wasn't wearing goggles like you would if you were wrecked. But this is not a weapon that is principally used to disable an individual for the purpose of obtaining physical control. And the line, the trilogy of Supreme Court cases. Is the muzzle speed then less than what would be, let's say, for a rubber bullet gun? I can't compare the actual muzzle speed, but I can attest, or if you look at the case, unless it's a Durrell case, it describes that. The nature of that weapon is significantly different. That is a lead encased shot. And it is, and in the Durrell case, this Court recognized or discussed that that was specifically, a weapon specifically used to disable individuals. And more importantly, the purpose. Part of the pepper spray, and if you don't mind me interrupting, is that you are supposed to control and disperse the individuals because of the cayenne pepper product. Sure. So, you know, it's like saying, to say that it's like a paintball, and you're not trying to confine the people is somewhat misleading. I mean, it's like tear gas or mace or anything else. The intent was to try to control the situation. But an intent to control the situation is not the same thing as an intent to seize. As you fire on people, generally the Supreme Court and others have said, that's a seizure. That's if you acquire physical control. Exactly. The different, and I disagree with that. In Tennessee v. Gardner, which was shooting of a rifle, the standard, the Court said that a seizure occurs when you use force that results in the person not being able to walk away. The purpose and the fact, and purpose is what's critical here, because Lewis tells us there's an intentionality element to a seizure. You have to intend to terminate a person's freedom of movement. It's not enough to either through a show of force or through a display of potential force or actual force to simply move people on. That doesn't fit the common law definition of a seizure, which is what Hidari D. tells us we need to follow. Instead, that is an act that is designed to exclude, make it uncomfortable, but it's not designed to disable so that you can then exercise physical control and terminate their freedom of movement. It's the precise opposite. It is to say, we're going to make it so unpleasant and uncomfortable for you that you cannot occupy this physical point on the planet. You need to go someplace else. All of the people who are the subject of this display, except for the unfortunate accident, and as was critical, the accident involving the plaintiff here, they were all free to leave and, in fact, did leave. But under your theory, if the police said, or someone said, in a different context, if you don't move, I'm going to shoot, and they do shoot, that's not a seizure, and the case law goes the other way on that. Again, I disagree. If we're talking about, I don't think there's not a single case that discusses the use of, say, a tear gas-type weapon. To immobilize. I mean, if you're mobilizing one way or the other, I mean, whether it's control, if you're controlling the person. Well, again, I would concede if you could show a purpose of the shot to immobilize, but not every shot, not every exercise of force is an immobilizing force. And, in fact, the exercise of force for 90 percent of the 15 to 20 percent of these kids was not immobilizing. It was simply to make uncomfortable. Immobilizing implies I'm going to stop you in place so I can control your physical movement, as opposed to I'm just simply going to make it uncomfortable for you so that you leave this one spot on the planet. And, again, I mean, if we look at Hadari D as an example, the court gives the example of if you say stop in the name of a law and the person runs away, that's not a seizure. Certainly no different if you say move and the person moves away. And I would submit it doesn't make a difference if you walked up and shoved the person if he didn't get away as an officer. But none of those events result in a termination of freedom of movement. And, in fact, for example, in the display of force cases, the test is whether or not under objective circumstances a person would understand that they are free to leave. Well, it doesn't make sense to adopt a different test if it's simply an exercise of force that essentially enforces that freedom to leave. And, in fact, if we look at the facts of both Hadari and Lewis, there you had an intent to subdue, an intent to control. But the force that was display of force, the force that was being used, the chase, was, in fact, moving people on from a spot on the planet. So it is entirely inconsistent. I hate to interrupt you, but I gave you a few extra minutes because your co-counsel cut into your time. But now you've gone over that mark a little bit. And I think we have your argument in hand, unless there are further questions. All right. Thank you, Your Honor. Rebuttal. Thank you, Your Honor. Simply put, it's our position that the officers, upon being ordered to shoot into this crowd and at this passive group of people who were doing nothing more than trying to comply with the officer's order. Is there any evidence that the order to shoot was to shoot at people as opposed to shoot at something nearby that would then disperse the pepper gas and force the kids to go back to their cars or go back to their apartments or go someplace else? Right. There isn't anything in the record, Your Honor, that explicitly says that Sergeant Wilson told these officers to shoot at the wall or to exercise area of contamination. Okay. But is there anything that suggests that when the officer said, you know, move on or stop or stay where you are or I'll shoot, that the instruction was I'm going to shoot at a person? Well, according to Bridget Collins, yes. It was that the statement was made to leave or you will be shot. Didn't the district court say that the officers aimed both at hard surfaces and at individuals who they observed throwing bottles? Yes. I mean, at some point. Now, whether that happened then or not, the district court didn't say. As well as we also have Officer Berrigan, who in his deposition says that he fired upon an individual in this location because he thought that this gentleman was holding back two women from leaving the scene. Yeah. We'll have to look at the record on that. But, I mean, your contention is there is such evidence. They say not. So we'll just have to sort that out. Right. It's a factual dispute, Your Honor. Any further questions? No. Okay. Thank you. Thank you, Counsel. Thank you both for your arguments. The case has heard will be submitted.
judges: Wallace, Thomas, Bybee